[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11825

_____

D.C. Docket No. 2:12-cv-00095-LGW-RSB


HIGH POINT, LLLP,

                                                            Plaintiff - Appellant

versus

NATIONAL PARK SERVICE, et al.,

                                                            Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(March 8, 2017)


Before TJOFLAT and ROSENBAUM, Circuit Judges, and KAPLAN,* District Judge.

_____

    * Honorable Lewis A. Kaplan, United States District Judge for the Southern District of New York, sitting by designation.

ROSENBAUM, Circuit Judge:

Although Otis Redding may have enjoyed wasting time by watching ships roll into the Dock of the Bay,[1] if he were sitting on Cumberland Island's Brick-Kiln Dock, he truly would be wasting his time, waiting in vain for ships that would never come. That's because dynamic environmental forces at play on Georgia's barrier islands have caused large amounts of sediment and siltation to render the waters around Brick-Kiln Dock increasingly shallow, making the dock inaccessible to most vessels. The Candler family, which uses the dock to access property located within the boundaries of Cumberland Island National Seashore, has sought to move or extend the dock to improve its accessibility. But the National Park Service, which manages the seashore, has refused to allow changes to the dock in order to protect the island's wilderness character.

So the family has sued, arguing that the deed by which the Candlers conveyed the island property to the government and reserved the right to continue to use the dock permits them to relocate the dock. Alternatively, the family contends that the Park Service's denial of permission to relocate or extend the dock

---

[1] STEVE CROPPER & OTIS REDDING, *(Sittin' On) The Dock of the Bay*, *on* THE DOCK OF THE BAY (Volt/Atco 1968). Redding tragically died in a plane crash in December 1967, just two days after he finished recording "(Sittin' On) The Dock of the Bay," so the song was released posthumously on January 8, 1968. Marc Myers, *Then I Watch 'Em Roll Away Again*, WALL ST. J. (Jan. 3, 2013 6:20 PM), http://www.wsj.com/articles/SB10001424127887323320404578213 633398825300. It later won the 1968 Grammy Awards for the Best Rhythm & Blues Male Vocal Performance and the Best Rhythm & Blues Song. *RockPopInfo Song Facts: (Sittin' On) The Dock of the Bay*, ROCKPOPINFO, http://www.rockpopinfo.com/songs/sittin-on-the-dock-of-the-bay--2/song-facts (last visited Aug. 2, 2016).

2

is arbitrary and capricious, in violation of the Administrative Procedure Act. After careful review and with the benefit of oral argument, we must conclude that "nothin's gonna change"[2] from the district court's decision, since neither the deed nor federal law supports the Candlers' position.

## I. Background

### A. Cumberland Island and High Point Compound

Cumberland Island is Georgia's largest barrier island, located off the southeast coast of the state. The island consists of uplands,[3] marshlands,[4] and various creeks. It is bounded by Cumberland Sound and the Cumberland River to the west and the Atlantic Ocean to the east. Historically, certain families used the island as an isolated vacation retreat. Among them, the Carnegie family claimed ownership of most of the island's uplands. The northernmost tract of land owned by the Carnegies was Tract 5N (also known as 5-N or N-5).

In 1930, Charles Howard Candler, Sr.—eldest son of Coca-Cola magnate Asa Candler—purchased property on the northern end of Cumberland Island in an area that came to be known as High Point. Over time, the Candlers acquired

---

[2] CROPPER & REDDING, *supra* note 1.

[3] In this opinion, the term "uplands" refers to those generally dry areas of Cumberland Island above the high-tide water line.

[4] The term "marshlands" includes those low-lying grassy areas that are regularly flooded by the tides.

approximately 1300 acres of property on the island, including the 38-acre parcel now described as the High Point Compound (the "Compound").

In 1958, the Candler family conveyed the property's ownership to High Point, Inc., which was later succeeded by Appellant High Point, LLLP ("High Point"), a corporation made up of Candler's descendants. To permit easier access to the Compound, the Carnegie family allowed the Candlers to build Brick-Kiln Dock (the "Dock") in Tract 5N. The Dock, which extends from the uplands portion of Cumberland Island into the marshlands and, specifically, Hawkins Creek (a tributary of the Brickhill River), is roughly 3.5 miles from the Compound. *See* Appendix.

Although the island has an airstrip, visitors to the Compound arrive primarily by boat. When traveling to the island, the Candler family departs by boat from nearby Jekyll Harbor Marina and traverses intracoastal sounds, creeks, and rivers on its way to the Dock. The distance between Jekyll Harbor and the Dock is approximately 11.8 miles, and the journey lasts for roughly 45 minutes. Upon arrival at the Dock, travel to the Compound takes 15-20 minutes by automobile over the island's unpaved roads.

Cumberland Island has other docks managed by the National Park Service ("Park Service"), including the public Plum Orchard Dock and Sea Camp Dock. And while High Point itself owns other docks on Christmas Creek, known as

4

Willow Dock and Cedar Dock, these do not provide deep-water access to the island.

B. Designation as a National Seashore

Beginning in 1970, the United States, through the National Park Foundation, began acquiring land on Cumberland Island with a view towards establishing a national park. On September 29, 1970, the Foundation acquired Tract 5N from the Carnegie family's Cumberland Island Holding Company. The deed conveying Tract 5N reserved "an easement as long as [the Cumberland Island Holding Company] owns real property or an Estate for Years on Cumberland Island, Georgia, for its invitees, licensees, and assigns, to use the roads, dock, and airstrip."

In 1972, Congress established the Cumberland Island National Seashore. 16 U.S.C. §§ 459i – 459i-9 (the "Seashore Act"). With respect to private property owners, the legislation authorized the Secretary of the Interior to acquire lands within the designated boundaries by purchase, donation, transfer, or exchange. 16 U.S.C. § 459i-1. In negotiating for the properties, the Secretary could allow private land owners on the island to retain "a right of use and occupancy of the property for noncommercial residential purposes" for a term of 25 years or the life of the owner. 16 U.S.C. §459i-3(a).

5

The Seashore Act also required the island to be "permanently preserved in its primitive state," with the exception of development for certain public recreation activities. 16 U.S.C. § 459i-5(b).

Finally, as relevant here, the Seashore Act directed the Secretary to recommend to the President the suitability of the national seashore for designation as wilderness under the Wilderness Act of 1964, 16 U.S.C. § 1132. The Wilderness Act of 1964, in turn, establishes a system for preserving federal lands in their "primeval" and "undeveloped" state, "untrammeled by man." 16 U.S.C. § 1131. The statute, which allows Congress to designate areas as wilderness on the recommendation of the President, 16 U.S.C. § 1132, requires wilderness areas to be administered "in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness." 16 U.S.C. § 1131(a).

C. Conveyance of High Point's Property to the United States

Since Cumberland Island's designation as a national seashore, the United States has acquired title to a majority of the privately owned land on the island. With respect to High Point, negotiations began in the early 1970s and culminated

years later in 1982, with High Point's sale of and corresponding conveyance of fee simple title to its Cumberland Island property.[5]

In furtherance of this transaction, before the end of 1981, the parties executed an Option Agreement for the sale of High Point's property subject to the terms and conditions of an attached Purchase and Sale Agreement. The Purchase and Sale Agreement specifically conditioned sale on the reservation of a right, free from interference, "to continue to use the area presently known as the Brick-Kiln Dock located on Hawkins Creek in tract N-5 Cumberland Island, Georgia." Beyond reserving use of the Brick-Kiln Dock, the Purchase and Sale Agreement also reserved to High Point rights to use the Christmas Creek docks, the airstrip, and the island's roads as well as "easements and rights of access, ingress and egress by water and air as presently existing and used by [High Point]." The duration of the reserved rights extended to the death of the last surviving named shareholder of the corporation, who is currently roughly 35 years old.

In anticipation of the acquisition, the Park Service commissioned an appraisal of the property. The appraiser concluded that "use of [the Dock], airstrip, main road and beach road, as well as exclusive use of the beach cabana, are necessary to the full use and enjoyment of the property as it exists today." Without

---

[5] The parties agreed to convey the land through the non-profit Trust for Public Land ("TPL"). The use of TPL as an intermediary has no bearing on the issues in this appeal.

the airstrip or Dock, the appraiser determined, restoring satisfactory all-weather access to High Point's property would require "an extensive investment."

On January 20, 1982, High Point executed a warranty deed conveying its property to the United States. The deed warranted title to all of the property above the high-water mark "but expresse[d] no warranty as to the title to those lands lying between the high and low water marks in the above-described lands, (including all marsh, beach, and tidal branches, rivers, streams, oceans, sounds, and other bodies of water), and of title to the land underlying said bodies of water."

Among other rights, the deed reserved rights to the High Point shareholders for the remainder of their lives for use "of the area presently known as Brick-Kiln Dock."[6] And, while the deed gave High Point four years to rebuild and modernize various dwellings located on the Compound without interference from the Park Service, after that time, High Point was prohibited from materially changing the character of any existing improvements or structures, performing new construction, or altering the topography of the land without the approval of the Park Service.[7]

---

[6] The deed specified the following reservation:

> SUBJECT to the reservation of use by High Point, Inc., and its shareholders, of the area presently known as Brick-Kiln Dock located on Hawkins Creek in Tract N-5 Cumberland Island, Georgia, free from unreasonable interference by GRANTEE, its successors and assigns, with such use, nor shall GRANTEE, its successors and assigns, be responsible for maintenance, repair, or any liability for its use[.]

[7] The deed's "Preservation" clause provides,

8

Nevertheless, the deed allowed High Point to conduct "normal maintenance" and repairs on the property's existing improvements and structures.[8]

Of note, the deed also contained language memorializing the parties' intent in High Point's conveyance of the property and its reservation of rights of use. That language described the intent as being to preserve the area "in its natural state as a part of Cumberland Island National Seashore."[9]

---

> After the expiration of such period of four (4) years from the date of this conveyance, High Point, Inc., and its shareholders, shall not add to nor materially alter the character of existing improvements or structures contained within the High Point Compound, other areas where High Point, Inc., and its shareholders, reserve easements and rights of use and occupancy nor perform any new construction or change the topography of the land without first having obtained the permission in writing of the GRANTEE, its successors and assigns. Any building or structure damaged or destroyed by fire or other casualty or deteriorated by the elements, or wear and tear, may be maintained, repaired, renovated, remodeled, or reconstructed so long as the basic character of the building or structure is not materially altered, from that existing as of the date of expiration of such four (4) year period as specified above.

[8] The deed's "Maintenance" section provides, in relevant part,

> With respect to the High Point Compound and areas in which High Point, Inc., and its shareholders, reserve easements and rights of use and occupancy, High Point, Inc., and its shareholders, shall have the right to make normal maintenance and upkeep of the property, to make modern modifications to existing structures and outbuildings, to make repairs and reconstruction to comply with safety or other sanitation codes, to replace roofing or siding, to shore up structures threatened by subsidence of soil and to repair or replace utility lines. . . .

[9] The "intent" provision of the deed states,

9

D. Designation as Wilderness

As we have noted, the Seashore Act instructed the President to evaluate whether areas of Cumberland Island National Seashore should be designated as wilderness under the Wilderness Act. 16 U.S.C. § 459i-8. In accordance with this provision, on the Park Service's recommendation, Congress designated 8,840 acres of Cumberland as wilderness under the Wilderness Act and 11,718 acres as "potential wilderness" until such time as prohibited uses of that land ceased. Act of Sept. 8, 1982, Pub. L. No. 97-250, § 2(a), 96 Stat. 709 ("Designating Act"). The Dock falls into both categories: while the upland section of Tract 5N on which part of the Dock sits was designated as wilderness, the marshlands under the remainder of the Dock were designated as potential wilderness. The Designating Act provided that Cumberland Island wilderness areas be managed under the provisions of the Wilderness Act "[s]ubject to valid existing rights." *Id.* § 2(c).

E. The Current Situation

At some point before 2008, a portion of the land separating Hawkins Creek from the Brickhill River breached upstream of the Dock. As a result, tidal flows

---

Intent. The use of High Point Compound and use of the areas for which easements and rights of use and occupancy are reserved, shall be limited to non-commercial residential purposes with the knowledge that the property is intended by the United States Congress to be preserved in its natural state as a part of Cumberland Island National Seashore. . . .

10

that had once swept sediment away from the Dock into the creek and river no longer do so, resulting in increased siltation around the Dock. So the downstream portion of the creek near the Dock has become too shallow for passenger vessels to navigate except during a period of about four hours during high tide. High Point maintains that as siltation continues, the Dock will become completely unusable as a deep-water dock.

For this reason, on June 16, 2008, High Point asked the Park Service for permission to move the Dock approximately 50 to 100 yards north of its current position to another bend in Hawkins Creek. The Park Service rejected the request, concluding that the deed did not give High Point a right to move or expand the Dock, and in the absence of such a right, the Wilderness Act prohibited relocating the Dock.

Over the next four years, the parties continued negotiating, with High Point proposing two alternatives—moving the Dock 900 feet south and directly on to the Brickhill River or extending the existing Dock to the southwest over Hawkins Creek and marshland and directly into the Brickhill River. At one point, the Park Service suggested that High Point could use the public Plum Orchard dock.

High Point retained environmental consultants to evaluate various other proposed solutions, but the consultant's report rejected all potential options as infeasible except the closing of the breach and the three solutions advanced by

High Point. With respect to the Plum Orchard dock option, the report deemed it inconvenient because Plum Orchard's location would increase the total travel time from Jekyll Harbor to the Compound to one-and-one-half or two hours, increase the distance the Candler family would have to travel over "bumpy roads" on the island, and force the Candler family to compete with members of the public for dock space.

Although the Park Service continued to reject High Point's requests to implement one of the relocation or extension options, in 2011, it asked High Point to provide extrinsic evidence regarding the parties' intentions regarding the Dock and access to the island at the time they executed the deed.

After reviewing this information, the Park Service agreed that the Dock, as currently situated, was essential to High Point and that siltation was a kind of "deterioration by the elements" that could permit repair of the dock in its current location. But the Park Service held firm to its position that nothing in the reserved-rights language of the deed allowed for reconstruction or relocation of the Dock. For this reason, the Park Service advised High Point that dredging Hawkins Creek, repairing the breach, or using Plum Orchard dock were the only permissible options.

The Park Service later withdrew its approval of closing the breach since that option would entail construction in a potential wilderness area. As for the

12

dredging option, the Park Service later clarified that although the agency would not oppose dredging, it would be obliged to present to Georgia state officials "objective comments" on the environmental impacts of dredging. But High Point itself had separately concluded that the dredging option would be too expensive, anyway, as it would require re-dredging whenever the siltation levels built up, which could be as often as once a year.

In a February 2012 letter, High Point asked the Park Service to reconsider its decision. First, it sought to demonstrate that the monetary and environmental costs of dredging or using the Plum Orchard dock would be far greater than the impact of permitting High Point to relocate or extend the Dock. And second, High Point argued that the Park Service had no authority to regulate High Point's activities in the marshlands, anyway, because, according to High Point, the state of Georgia— not the United States—holds title to the marshlands.

The Park Service declined to reconsider its decision. With respect to the costs of not permitting High Point to relocate or extend the Dock, the Park Service reaffirmed its view that the deed language simply did not permit the relocation or extension of the Dock. And in the absence of deed language allowing for such construction, the Park Service explained, the Wilderness Act effectively tied the Park Service's hands, so the Park Service could not authorize the relocation or extension of the Dock. The letter also rejected High Point's contentions that it

could not use Plum Orchard as an alternative, noting that the dock is not within a wilderness area and opining that the extended travel time, while not convenient, is not impracticable.

As for High Point's contention that Georgia, not the United States, owns the marshlands, the Park Service later responded that under 36 C.F.R. § 1.2(a)(3), ownership of the marshlands makes no difference to the Park Service's statutory obligation and authority to prohibit dock construction over waters and marshlands that are within the wilderness areas of Cumberland Island National Seashore. Since the Dock falls within the bounds of the National Seashore and the marshlands over which High Point seeks to extend or relocate the Dock are within the reach of waters subject to the Park Service's jurisdiction, the Park Service reasoned, actual ownership of the marshlands could not affect the Park Service's authority.

## F. High Point's Lawsuit

When negotiations with the Park Service failed to bear fruit, High Point filed suit on May 10, 2012, in the Southern District of Georgia, against the Park Service and several of its officials. The first count of High Point's suit seeks judicial review of the Park Service's denial of High Point's request as a final agency action

under the Administrative Procedure Act ("APA").[10]  The second count requests a declaratory judgment that the Park Service has both statutory authority and a legal obligation to approve construction or relocation of the Dock.

Both parties filed cross-motions for summary judgment.  On February 27, 2015, the district court granted the Park Service's motion and denied High Point's motion.  First, the district court concluded that the deeds unambiguously prohibited High Point from moving or extending the Dock without the Park Service's permission.

Because it found that the deeds did not allow for relocation of the Dock, the district court then considered whether the Park Service was authorized to permit relocation under federal law.  The district court agreed with the Park Service, concluding that the Wilderness Act and this Circuit's precedents categorically barred the Park Service from allowing construction in wilderness areas.  In reaching this conclusion, the district court considered and rejected High Point's contention that the Park Service had no authority over the marshlands.  Instead, the district court determined that regardless of ownership, the Park Service had authority to regulate nonfederal lands within the boundaries of a national park.

High Point now appeals the district court's judgment, arguing that the deed unambiguously reserves to High Point a right to relocate the Dock.  Alternatively,

---

[10] Both parties agree that the Park Service's denial of permission to relocate or replace the Dock represents a final agency decision under the APA.

High Point urges, the deed is ambiguous, and extrinsic evidence demonstrates that the parties intended to reserve to High Point such a right. In light of this intention, High Point contends, the Park Service is both authorized and obligated to approve relocation or extension of the Dock.

## II. Standards of Review

We review *de novo* a district court's grant of summary judgment in an APA case, employing the same standards as the district court. *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009). Summary judgment "is proper if, when viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 911 (11th Cir. 2007).

As for High Point's APA claim, courts may set aside a final agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C); *Miccosukee Tribe*, 566 F.3d at 1264. A decision is arbitrary and capricious when, among other flaws, "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Miccosukee Tribe*,

16

566 F.3d at 1264 (quoting *Ala.-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007)).

## III. Discussion

### A. High Point has no reserved right to move or extend the Dock

At the outset, we note that both parties agree—and we do, too—that we interpret the deed language under the contract law of Georgia. *See Hardman v. Dahlonega-Lumpkin Cty. Chamber of Commerce*, 233 S.E.2d 753, 755 (Ga. 1977). Under Georgia law, courts determine in the first instance whether deed language is clear and unambiguous. *Flanders v. Cook*, 144 S.E. 903, 904 (Ga. 1928); *see Begner v. United States*, 428 F.3d 998, 1005 (11th Cir. 2005) (quoting *Eudy v. Universal Wrestling Corp.*, 611 S.E.2d 770, 773 (Ga. Ct. App. 2005)). Only if a court finds an ambiguity may it attempt to resolve the ambiguity by applying Georgia's rules of construction, such as evaluating extrinsic evidence. *See Eudy*, 611 S.E.2d at 773.

High Point contends that two parts of the deed conveying its property to the United States unambiguously reserve to High Point a right to unilaterally relocate the Dock to maintain deep-water access to Cumberland Island. First, High Point relies on the deed's reservation to High Point's shareholders of use "of the area presently known as Brick-Kiln Dock located on Hawkins Creek in Tract N-5." Second, High Point invokes the deed's "Preservation" clause to support its

17

contention that the parties contemplated unilateral relocation or reconstruction of the Dock.  We are not persuaded.

### 1.  The Brick-Kiln Dock Reservation

High Point's argument that the Brick-Kiln Dock reservation authorizes relocation and expansion boils down to the idea that the word "area" in the reservation of use of "the area presently known as Brick-Kiln Dock located on Hawkins Creek in Tract N-5" must be broadly construed to support a reservation of use of the entire N-5 tract for deep-water access.  That construction is simply not sustainable.

First, it ignores the explicit limiting impact that the phrase "presently known as Brick-Kiln Dock" has on its right of use.  Only Brick-Kiln Dock is known as Brick-Kiln Dock, not any other part of Tract N-5.

Second, High Point's interpretation of this language does not account for the significant fact that the deed contains no mention of preserving deep-water access. Had the parties intended to reserve High Point's deep-water access in general—as opposed to its use of the Dock—the deed could have easily said so.[11]

---

[11] While we do not rely on extrinsic evidence because the language of the deed is clear, we nonetheless note that both parties were well aware of the importance of deep-water access and the access risks posed by the dynamic environment of Cumberland's marshlands.  We are not at liberty to expand the parties' bargain.

A straightforward reading of the deed language demands the conclusion that High Point reserved only a right to *use*—not to move or to extend—the Dock as it was "presently known" at the time of the conveyance.

## 2. The "Preservation" Clause

High Point similarly misplaces its reliance on the "Preservation" clause. That clause provides that "[a]ny building or structure . . . deteriorated by the elements . . . may be maintained, repaired, renovated, remodeled, or reconstructed so long as the basic character of the building or structure is not materially altered."

Accepting for the present that siltation in Hawkins Creek qualifies as "deterioration by the elements," High Point does not explain how relocating or extending the Dock is not a material alteration of its basic character. We agree with the district court: High Point's argument that the "basic character" of a structure encompasses just the types of materials used and an object's general purpose, but not its design or location, "is strained." Indeed, even High Point concedes that a structure's basic character can depend in some instances on "how the structure fit[s] within its environment." Given the wilderness-preservation goals Congress had in mind for the Cumberland Island National Seashore, we view the Dock's footprint and location in the natural environment as a rather significant aspect of its "basic character."

Nor does High Point's reliance *Calhoun, GA NG, LLC v. Century Bank of Georgia*, 740 S.E.2d 210 (Ga. Ct. App. 2013), provide precedent for authorizing what the deed's language does not.    High Point invokes *Calhoun* for the proposition that easements can and must be relocated if the relevant contract language contemplates such relocation, even if, as is the case here, the relocation of an easement is not specifically mentioned in the deed.    But *Calhoun* does no more than require compliance with the parties' agreement as expressed in the contract at issue.

In *Calhoun*, the holder of Tract 2 granted an easement to the holder of Tract 1 to use "sidewalks, entrances, drives, lanes, service drives and parking areas, which are now or may hereafter from time to time be constructed and used for pedestrian and vehicular traffic." *Calhoun*, 740 S.E.2d at 213 (emphasis omitted). The conveyance also allowed each tract owner "the right to expand, alter, modify all or part of the buildings now or hereafter constructed on said tracts, or develop said tracts in any manner they see fit." *Id.* (emphasis omitted).  At the time of the suit, a bank acquired Tract 2, the servient estate, and Calhoun owned Tract 1, the dominant estate.  *Id.* at 211.  The bank wanted to build a convenience store and gas station that would have altered or eliminated some existing easement areas used by Calhoun on Tract 2.  *Id.* at 212.

20

The Georgia appellate court upheld a grant of summary judgment in the bank's favor. After first noting that under Georgia law, both estates must consent to alteration of a fixed easement, the court also observed that a "servient estate has the right to relocate an easement if the instrument creating the easement so provides." *Id.* (quoting *SunTrust Bank v. Fletcher*, 548 S.E.2d 630, 633 (Ga. Ct. App. 2001)). Although the conveyance did not expressly discuss relocation of existing easements, the court held that the parties' language contemplated that the sidewalks and parking areas on Tract 2 might change over time and that the broad reservation to develop the tracts in any manner permitted the bank's development so long as Calhoun maintained its easement over any new such areas established on Tract 2. *Id.* at 213-14.

High Point likens the bank's removal of current parking areas to the siltation of the Dock in that, in both cases, events have caused use of the existing easement to become impractical. In High Point's view, *Calhoun* establishes that this type of impracticality requires relocation of a current easement, even when the language of the conveyance does not specifically address relocation of easements.

But rather than helping High Point, *Calhoun* merely affirms that the language of the parties' contract controls. The Georgia court did not rest its analysis in *Calhoun* on impracticality. Instead, it construed the broad language of the conveyance to demonstrate the parties' contemplation and intent that existing

easements would require relocation over time. Indeed, as we understand the contract at issue in *Calhoun*, the language in granting "the right to expand, alter, modify all or part of the buildings now or hereafter constructed, or develop said tracts in any manner they see fit" effectively would have been meaningless if the servient estate could not also relocate easements affected by exercise of the servient estate's right to expand, alter, modify, and develop. And the contract's use of the word "or" in the phrase "or may hereafter . . . be constructed," as opposed to use of the term "and" in that phrase, contemplated that easements that existed at the time that the contract was executed might not exist in their then-current form later.

But the deed here is far more restrictive in terms of what it permits High Point to do on the property. It expressly constrains High Point's use to the existing dock. It also requires the Park Service to approve significant alterations of the property's structures. And it unmistakably reflects the parties' intent that the Dock (and other property) will be used "with the knowledge that the property is intended by the United States Congress to be preserved in its natural state." Unlike in *Calhoun*, the deed here contains no language that implies that the parties agreed to permit High Point's unilateral relocation or extension of the Dock. And absent language expressly or impliedly permitting movement of a fixed easement,

22

Georgia law precludes unilateral movement.  *See Herren v. Pettengill*, 538 S.E.2d 735, 736-37 (Ga. 2000).

In short, under the plain language of the deed, nothing allows High Point to relocate or extend the Dock.[12]  We therefore affirm the district court's determination that High Point has no reserved right to unilaterally relocate or extend the Dock.

B.  The Park Service's denial of permission to relocate or extend the Dock was not arbitrary or capricious and did not exceed its authority

Our conclusion that High Point has no unilateral right to move or extend the Dock does not end our inquiry.  The deed allows High Point to seek permission from the Park Service for new construction or alterations, and High Point maintains that the Park Service's denial of that permission was arbitrary and capricious and exceeded the Park Service's authority.  Specifically, High Point claims that the Park Service denied its request based on a misapplication of the Wilderness Act and a misapprehension of the Park Service's regulatory authority over tidal marshlands.  We disagree.

*1. The Wilderness Act forecloses relocation of the Dock*

---

[12] For this reason, we do not reach High Point's alternative argument that the language is ambiguous.  But we nonetheless note that even High Point identifies no part of the deed's language that it suggests is actually ambiguous regarding its alleged right to relocate the Dock. Under Georgia law, a contract "is ambiguous if it contains a 'duplicity, indistinctness, an uncertainty of meaning or expression' that makes it susceptible to several reasonable interpretations."  *Begner*, 428 F.3d at 1005 (citing *Holcim (US), Inc. v. AMDG, Inc.*, 596 S.E.2d 197, 200 (Ga. Ct. App. 2004)).

Congress enacted the Wilderness Act "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." 16 U.S.C. § 1131(a).  To meet this purpose, the Act allows for the designation of wilderness areas that "shall be administered for the use and enjoyment of the American people in such manner as will leave [the lands] unimpaired for future use and enjoyment as wilderness," and provides a framework for the protection and preservation of designated areas.  *Id.*  The Act further instructs that the agency assigned to manage such protected areas shall manage the property in its charge in a manner designed to preserve the "wilderness character" of the area:

> Except as otherwise provided in this chapter, each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and *shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character*.  Except as otherwise provided in this chapter, wilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use.

16 U.S.C. § 1133(b) (emphasis added).  In furtherance of these goals, the statute severely restricts activities and structures in wilderness areas:

> Except as specifically provided for in this chapter, and subject to existing private rights, there shall be no commercial enterprise and no permanent road within any wilderness area designated by this chapter and, except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter (including measures required in emergencies involving the health and safety of persons within the area), *there*

24

> *shall be* no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and *no structure or installation within any such area.*

16 U.S.C. § 1133(c) (emphasis added).  Indeed, the Wilderness Act categorically prohibits structures in wilderness areas subject to two exceptions:  a private-rights exception and an administrative-needs exception.  *Id.*; *see Wilderness Watch v. Mainella*, 375 F.3d 1085, 1093 (11th Cir. 2004).

In *Mainella*—a case that also involved Cumberland Island—a panel of this Court construed § 1133(c)'s prohibition on motor-vehicle use in light of the administrative-needs exception.  First, the panel determined that Congress had spoken clearly and unambiguously in the Wilderness Act, obviating any need for deference to the Park Service's construction of the statute.  *See* 375 F.3d at 1091 & n.7.  The panel then observed that the clear purpose of the Act was the preservation of untrammeled natural areas.  *Id.* at 1091-92.  In rejecting the Park Service's practice of allowing of tourists to "piggyback" on official vehicle trips to Cumberland's historical sites, the Court held that § 1133(c)'s prohibitions were "categorical" "except 'as necessary'" for minimum administration of the wilderness area, and in no sense could a van filled with tourists "be construed as 'necessary' to meet the 'minimum requirements' for administering the area 'for the purpose of [the Wilderness Act].'"  *Id.* at 1092-93.

25

High Point relies on the private-rights exception here rather than the administrative-needs exception discussed in *Mainella*, but the distinction is immaterial. Given the stringent, preservation-oriented purposes of the Wilderness Act, this Court has found the prohibitions in § 1133(c) to be categorical and subject to only very limited, narrow exceptions. *Mainella*, 375 F.3d at 1092-93. High Point cannot show that the narrow private-rights exception to the Wilderness Act's strong preservation purposes applies any more than the Park Service could show in *Mainella* that the administrative-needs exception relieved the Park Service of its obligations under the Wilderness Act.

To overcome the Wilderness Act's clear purposes, High Point contends that the private-rights exception not only permits but in fact obligates the Park Service to approve relocation or extension of the Dock. It reasons as follows: because, in High Point's view, High Point has retained a private right of deep-water access to Cumberland Island, the Park Service must accommodate construction that advances that allegedly existing private right.

This argument is based entirely on a faulty premise—that High Point retained a private right of deep-water access to Cumberland Island. But, in fact, as we have explained, High Point reserved no such right in the deed conveying its property. So High Point simply has no "existing private rights" that fall within the

exception to § 1133(c)'s categorical prohibition on the construction of structures in wilderness areas.

The law is clear:  with the exception of the existing Dock (in which High Point does have an "existing private right[]"), "there shall be . . . no structure or installation" within any wilderness area.  The Wilderness Act's clear prohibitions relieved the Park Service of any discretion to grant High Point's requests to relocate or extend the Dock.  Because the Park Service's denial of High Point's requests rests on a correct view of the Wilderness Act, the district court did not err in concluding that the Park Service's decision was neither arbitrary nor capricious.

## 2.  *The Park Service is authorized to regulate the marshlands*

In an attempt to avoid the barriers of the Park Service and the Wilderness Act, High Point claims that it can achieve its objectives solely by extending the marshlands portion of the Dock without altering the wilderness-bound upland part of the Dock in any manner.  In High Point's view, even if the Wilderness Act prohibits construction in the uplands portion of Cumberland Island that was designated as "wilderness," the Park Service lacks authority to deny any modification or extensions of that portion of the Dock extending over the marshlands that were designated as "potential wilderness."  As High Point's argument goes, the Park Service has no regulatory authority over the marshlands because the State of Georgia—rather than the federal government—holds title to

27

them, and Congress intended that the Park Service exercise authority over only the federally owned lands at Cumberland.

The law does not support High Point's claim. Regardless of who actually owns the marshlands, federal law unambiguously displays congressional intent to empower the Park Service to regulate the marshlands designated as potential wilderness on Cumberland Island. In particular, the Park Service's establishing law and the Seashore Act make this fact abundantly clear.

The Park Service's establishing law, in effect at the time that High Point made its requests, extended the Park Service's regulatory power to federal "areas"; it did not mention federal ownership:

> The service thus established shall promote and *regulate the use of the Federal areas known as national parks*, monuments, and reservations hereinafter specified, . . . by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1 (emphasis added), *repealed by* Act of Dec. 19, 2014, Pub. L. No. 113-287, § 7, 128 Stat. 3094, 3272-73;[13] *see also* 16 U.S.C. § 3 (repealed 2014)

---

[13] The 2014 law recodified the Park Service statutes as positive law in Title 54 of the United States Code. Although the new statute modified the prior statutes in many ways, the relevant language here remains materially unchanged. *See* 54 U.S.C. § 100101(a). In addition, the repealing legislation specified that any repealed sections were repealed "except with respect to . . . proceedings that were begun before the date of enactment of this Act[.]" § 7, 128 Stat. at

(providing that the Secretary of the Interior "shall make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks, monuments, and reservations under the jurisdiction of the National Park Service").

As several of our sister circuits have recognized, this regulatory authority extends to non-federally owned land encompassed within national park boundaries. *See, e.g.*, *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 630 F.3d 431, 442 (5th Cir. 2011); *United States v. Stephenson*, 29 F.3d 162, 164 (4th Cir. 1994) ("The primary inquiry in determining the applicability of Park laws to a given area must therefore be whether that area is within the statutory boundaries of the Park, not whether [the Park Service] holds title to the land in question."); *Free Enter. Canoe Renters Ass'n of Mo. v. Watt*, 711 F.2d 852, 856 (8th Cir. 1983); *see also United States v. Brown*, 552 F.2d 817, 821-22 (8th Cir. 1977) (holding that the broad authority granted to Congress by the Constitution's Property Clause authorizes the federal government "to regulate activities on non-federal public waters in order to protect wildlife and visitors on [federal] lands").[14]

---

3272-73. Because High Point's lawsuit predates the recodification, the prior version's language applies to this case.

[14] High Point has not contested the constitutional power of Congress to authorize federal regulation of non-federally owned park lands. Instead, High Point argues only that, in this case, Congress did not intend to authorize federal regulation of state-owned marshlands on Cumberland Island.

29

In addition to the Park Service's general regulatory authority, the Seashore Act gives the Park Service regulatory authority over non-federally owned lands within the bounds of the Cumberland Island National Seashore.  In establishing the Cumberland Island National Seashore, the Seashore Act placed the marshlands within the boundaries of the federal park.  It further authorized the Park Service to "administer[], protect[], and develop[]" the seashore in accordance with the Park Service's establishing statutes.  16 U.S.C. § 459i-5(a).  And it empowered the Park Service to use any other available statutory authority for conservation and management of the island's natural resources, instructing that all land within the park be managed with an eye towards preserving non-recreational areas in their "primitive state."  *Id.*; 16 U.S.C. § 459i-5(b).

Besides the fact that the marshlands fall within the boundaries of the Cumberland Island National Seashore, the bill designating Cumberland Island as wilderness identified the marshlands under the Dock as "potential wilderness." *See* Act of Sept. 8, 1982, Pub. L. No. 97-250, § 2(a), 96 Stat. 709.  And the House and Senate reports accompanying the designating bill expressed Congress's desire that "[t]o the extent it can legally do so, the National Park Service is expected to manage the potential wilderness areas as wilderness, according to the provisions of the Wilderness Act of 1964."  H.R. Rep. No. 97-383, at 4-5; S. Rep. No. 97-531, at 3.  The reports expressed this intent even though they acknowledged that the State

of Georgia—and not the United States—held title to the intertidal marshlands designated as potential wilderness.  *See* H.R. Rep. No. 97-383 at 4, 6; S. Rep. No. 97-531, at 3, 4-5.

Pursuant to its authority under these statutes, the Secretary of the Interior has promulgated regulations governing the national park system.  Those regulations apply to, among other things, "submerged lands, tidelands, [and] lowlands" within national parks, regardless of the ownership of such areas:

> Waters subject to the jurisdiction of the United States located within the boundaries of the National Park System, including navigable waters and areas within their ordinary reach (up to the mean high water line in places subject to the ebb and flow of the tide and up to the ordinary high water mark in other places) *and without regard to the ownership of submerged lands, tidelands, or lowlands*[.]

36 C.F.R. § 1.2(a)(3) (emphasis added).[15]   As relevant here, the Park Service regulations prohibit private parties from "[c]onstructing or attempting to construct a . . . boat dock . . . upon[,] across, over, through, or under any park" without permission.  36 C.F.R. § 5.7.

---

[15] High Point asserts that § 1.2(a)(3) does not apply to the marshlands, based on the language of 36 C.F.R. § 1.2(b).  That is simply incorrect.  Section 1.2(b) provides, in relevant part, "The regulations contained in [Part 1] . . . of this chapter do not apply on non-federally owned lands and waters . . . located within National Park System boundaries, *except as provided in paragraph (a)* . . . ." (emphasis added).  Put simply, § 1.2(b) unambiguously exempts § 1.2(a)(3) from its grasp.

31

In addition, as a matter of policy, the Park Service manages potential wilderness areas on Cumberland Island as wilderness to the extent possible. *See Mainella*, 375 F.3d at 1088 n.2.

The upshot of this litany of statutes and regulations is that, contrary to High Point's assertions and characterizations, Congress clearly intended for the Park Service to exercise protective authority over those tidal marshlands within the boundaries of Cumberland Island National Seashore that have been designated as potential wilderness, including those under the Dock, with full recognition that the marshlands are not owned by the United States. So even accepting that High Point can parse the Dock into uplands and marshlands parts and extend the latter without impacting the former, the Park Service was properly empowered—and indeed obligated—to deny High Point's request to do so based on its authority and responsibility to protect the marshlands within Cumberland Island National Seashore as wilderness.

## IV. Conclusion

For these reasons, we **AFFIRM** the judgment of the district court.

## APPENDIX

