[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05–14461

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 5, 2006
THOMAS K. KAHN
CLERK

D.C. Docket No. 03-01230 CV–ODE–1

OUACHITA WATCH LEAGUE,
JERRY WILLIAMS,
FOREST CONSERVATION COUNCIL,

Plaintiffs–Appellants,

versus

ROBERT JACOBS, in his official capacity as Regional Forester
of the Southern Region of the U.S. Forest Service,
DALE BOSWORTH, in his official capacity as Chief of the U.S. Forest Service,
U.S. FOREST SERVICE, an agency of the U.S. Department of Agriculture,
ANN M. VENEMAN, in her official capacity as Secretary
of the U.S. Department of Agriculture,
U.S. DEPARTMENT OF AGRICULTURE,

Defendants–Appellees.

_____

No. 05–14462

_____

D.C. Docket No. 01–01976 CV–ODE–1

THE CHATTOOGA CONSERVANCY,
BIODIVERSITY LEGAL FOUNDATION,
FLORIDA BIODIVERSITY PROJECT,
FOREST CONSERVATION COUNCIL,
GEORGIA FORESTWATCH,
OUACHITA WATCH LEAGUE,
SIERRA CLUB,
SOUTHERN APPALACHIAN BIODIVERSITY PROJECT,
WILD ALABAMA,
WILD SOUTH,
WILDERNESS SOCIETY,

                Plaintiffs–Appellants,

    versus

ROBERT JACOBS,
as Regional Forester of the Southern Region
of the U.S. Forest Service,
U.S. FOREST SERVICE,

                Defendants–Appellees.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(September 5, 2006)**

Before ANDERSON, BARKETT and CUDAHY,[*] Circuit Judges.

---

[*] Honorable Richard D. Cudahy, Circuit Court Judge for the Seventh Circuit, sitting by designation.

CUDAHY, Circuit Judge:

The basic substantive issue in this consolidated appeal is whether a coalition of environmental groups (collectively, Ouachita) is correct that the U.S. Forest Service's (Forest Service's) changes to certain forest plans[1] in the Southern Region[2] of the United States failed to comply with the National Environmental Policy Act (NEPA) and the National Forest Management Act (NFMA). The district court never reached that issue, concluding instead that the majority of Ouachita's claims were not ripe for review. That conclusion was wrong, since it was based primarily on a construction of the ripeness doctrine that is generally standard but does not apply in NEPA suits. Because we find no merit in the Forest Service's claims that Ouachita lacks standing and that certain claims are now moot (both of which it raised for the first time on appeal), we reverse the judgment of the district court and remand the case for further proceedings.

I. BACKGROUND

---

[1] Forest plans are land and resource management plans that provide for multiple uses of the forest, including outdoor recreation, range, timber watershed, wildlife and fish, and wilderness. 16 U.S.C. § 1604 (2006).

[2] The Southern Region covers Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, Oklahoma, Puerto Rico, South Carolina, Tennessee, Texas and Virginia. 36 C.F.R. § 200.2 (2006).

The central dispute between the parties in this case centers on environmental impact statements and records of decision (collectively, EISs) for forests in three subregions of the Southern Region (specifically, the Appalachian Mountains subregion, the Coastal Plain/Piedmont subregion and the Ozark/Ouachita Mountains subregion). These EISs, which the Forest Service completed following our decision in *Sierra Club v. Martin*, 168 F.3d 1 (11th Cir. 1999), relate to revisions and amendments to the Forest Service's procedures for collecting information on proposed, endangered, threatened and sensitive species, commonly called PETS. Ouachita argues that these EISs fail to consider and are inconsistent with three earlier vegetative management plans and EISs (collectively, VMEISs) for the Southern Region, which the Forest Service completed in 1989.

The 1989 VMEISs cover more than 12.6 million acres of national forest land spanning 13 states. They specifically consider five distinct methods of vegetation management,[3] along with (pursuant to 40 C.F.R. § 1502.14 (2006)) measures to mitigate any potential damages that those methods might cause.

The VMEISs require that when the Forest Service considers using one of the five vegetation management methods, it perform a biological evaluation of the effects

_____

[3] The five methods of vegetation management are: (1) prescribed fire; (2) mechanical methods (such as bulldozers and mowers); (3) manual methods (such as clippers and chainsaws); (4) biological methods (such as grazing); and (5) herbicides. (R., *Chattooga Conservancy*, 69:Vol. IV, tab 1 at vi–viii.)

4

on PETS as part of its consideration. Specifically, the VMEISs provide that:

> [w]hen adequate population inventory information is unavailable, it must be collected when the site has a high potential for occupancy by a threatened, endangered, proposed, or sensitive species.

(R., *Chattooga Conservancy*, 69:Vol. IV, tab 1 at II–41.) The Forest Service interpreted this language to require population inventories only if the site has a high potential for occupancy by PETS. *Martin*, 168 F.3d at 4. Information about the habitats, it reasoned, satisfied the monitoring requirement. *Id.* The Forest Service later amended the forest plans for each forest at issue in this case to include this PETS-monitoring language.

In 1996, several plaintiffs involved in the present appeal sued the Forest Service, arguing that its interpretation of the PETS-monitoring language was incorrect. On appeal, we concluded that the plain language of the VMEISs' provision required the Forest Service to perform population inventories in project areas where such inventories were not "available." *Id.*

Not long after *Martin*, the Forest Service amended the forest plans of three national forests to adopt revised PETS-monitoring provisions. This new language provided that, in certain circumstances, the Forest Service need not perform inventories but could instead assume the presence of PETS *if* suitable habitats were

present.[4]  The Forest Service has since replaced these amendments and adopted new language.[5]

In response to the amendments (and before the adoption of the new language), several environmental groups sued the Forest Service on July 26, 2001.  *Chattooga*

---

[4] The substantially identical revisions provide in full:

However, there are some PETS species and situations where information to determine potential effects to PETS species may not require field surveys.  For these situations, the PETS species in question would be assumed to occur in the area if suitable habitat is present, and effects to the species would be considered in the effects analysis.  These situations occur when:

1.  There is a low likelihood of detecting a particular species: a field survey probably would not find that species and therefore could not provide definitive information for excluding a species being considered for protection.
2.  Established Forest Plan direction or mitigation that effectively protects PETS species expected to occur in suitable habitat in the project vicinity is already in place and is part of the proposed action.
3.  Habitat requirements of a PETS species are well known and (a) there is sufficient evidence that the proposed actions would have only short- or long-term beneficial effects or no adverse effects to PETS species or (b) any expected adverse effects of the proposed actions would not be likely [to] cause it to be Federally listed or to suffer reduced viability.

(R., *Chattooga Conservancy*, 69:Vol. IV, tab 5 at 2; 70:Ex. A–1 & B–1.)

[5] The new language states that "A biological evaluation of how a project may affect any species Federally listed as threatened, endangered or proposed, or identified by the Forest Service as sensitive shall be done as part of the site-specific environmental analysis.  This evaluation considers available information on threatened, endangered, proposed, and sensitive species populations and their habitat for the proposed treatment area." (R., *Chattooga Conservancy*, 69:Vol. IV, tab 9 at 2–4.)

*Conservancy v. Jacobs*, 373 F. Supp. 2d 1353 (N.D. Ga. 2005).  The basic theory of *Chattooga Conservancy* was that these amendments were a thinly veiled attempt to avoid the requirements of *Martin*.  Specifically, the complaint alleged that the forest plan amendments and revisions violated the governing regional VMEISs. In addition, the complaint alleged that the Forest Service violated NEPA in several ways, including by failure to prepare supplements to the regional VMEISs *before* making the plan amendments and revisions.

In response to the complaint, the Forest Service gave notice of its intention to prepare supplements to the VMEISs and to amend the Forest Service Manual to include a new requirement of a time to perform population inventories for PETS species.  Both the forest plan amendments and the manual revision eliminated the requirement that the Forest Service collect population inventory data on PETS species.

On May 7, 2003, many of the plaintiffs involved in *Chattooga Conservancy* filed another suit challenging a number of site-specific projects on several national forests, most of which were severed and transferred.  *Forest Conservation Council v. Jacobs*, 374 F. Supp. 2d 1187 (N.D. Ga. 2005).  The portion of the complaint in that action relevant to the present appeal challenged the Forest Service's NEPA

compliance with respect to Amendment 31 to the Ouachita National Forest Plan,[6] which specifically revised that plan so that the Forest Service could rely upon "habitat information" instead of "population inventories." The Forest Service now claims that Ouachita's challenge to Amendment 31 is moot. *Chattooga Conservancy* and *Forest Conservation Council* (the latter of which the parties refer to as "*Wild South*") were consolidated for the purposes of this appeal.

## II. DISCUSSION

We review a district court's entry of summary judgment, along with threshold justiciability determinations, de novo. *Sierra Club v. Tenn. Valley Auth.*, 430 F.3d 1337, 1344 (11th Cir. 2005); *Wilderness Soc'y v. Alcock*, 83 F.3d 386, 389 (11th Cir. 1996). We review an agency's decisions pursuant to NEPA under the arbitrary and capricious standard of the Administrative Procedure Act (APA). 5 U.S.C. § 706(2)(A) (2006); *City of Oxford v. FAA*, 428 F.3d 1346, 1351 (11th Cir. 2005).

*A. Threshold Justiciability Considerations*

---

[6] The text of Amendment 31 is provided *supra* note 4.

8

The Forest Service has challenged Ouachita's claims on ripeness, mootness and standing grounds—the latter two of which it raised only on appeal. We begin with the standing consideration, since we have an obligation to assure ourselves of a litigant's standing under Article III, which provides a fundamental limitation on a federal court's authority to exercise jurisdiction. *DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1860–61 (2006).

1. STANDING

Resolving the Forest Service's claim that Ouachita lacks standing requires analysis under both the constitutional and the nonconstitutional or prudential standing doctrines. *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004). Since this case involves a coalition of environmental groups, the rules for associational standing also apply. That is, "[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *Tenn. Valley Auth.*, 430 F.3d at 1344. So long as one party has standing,

other parties may remain in the suit without a standing injury. *Clinton v. City of New York*, 524 U.S. 417, 434–36 (1998).

The requirements for constitutional standing are familiar: Ouachita must show that it has suffered an injury in fact that was caused by the Forest Service's actions and that can be redressed by a favorable judicial decision. *Friends of the Earth*, 528 U.S. at 180–81 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). In environmental suits, the injury-in-fact inquiry tends to be more searching than the causation or redressability considerations. *Sierra Club v. Johnson*, 436 F.3d 1269, 1277–78 (11th Cir. 2006); *see also Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 972 (9th Cir. 2003); *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001).

Although the statutory scheme, acronyms and terms of art make this case appear somewhat confusing at the outset, the fundamental dispute with respect to which we analyze standing is rather straightforward: Ouachita alleges that the Forest Service has shirked its duties under NEPA and NFMA, with the result that already vulnerable species and their habitats are now more vulnerable. The injury that Ouachita asserts is a procedural injury, but that does not fundamentally alter the constitutional standing analysis. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004). To show a cognizable injury in fact in a procedural injury case,

10

a plaintiff must allege that the agency violated certain procedural rules, that these rules protect a plaintiff's concrete interests and that it is reasonably probable that the challenged action will threaten these concrete interests. *Johnson*, 436 F.3d at 1278–79.

Because the Forest Service has raised the issue of Ouachita's standing for the first time on appeal, we must look to the declarations in the record to determine whether Ouachita has standing to maintain the suit. *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 806–07 (11th Cir. 1993). Turning to the declarations requires that we pause briefly to resolve two motions pending before us: the Forest Service's motion to strike declarations that Ouachita filed with its reply brief and Ouachita's cross-motion for leave to file those declarations.

Although we generally do not consider evidence that the parties did not submit in the district court, we have the power to do so when doing so is in the interests of justice and judicial economy. *Young v. DeVaney ex rel. City of Augusta, Ga.*, 59 F.3d 1160, 1168 (11th Cir. 1995). Where "additional material would be dispositive of pending issues in the case," we are often more willing to allow supplementation of the record. *Id.* Here, the record indicates that the Forest Service challenged Ouachita's general standing to maintain this suit for the first time on appeal, although it did make site-specific standing challenges in the trial court. Given that the

declarations in question resolve the standing issue and illuminate the mootness issue, and given the length of time that these environmental suits have been pending, we conclude that it is in the interests of justice and efficiency to consider the supplemental declarations. We therefore deny the Forest Service's motion to strike the declarations and grant Ouachita's motion for leave to supplement the record on appeal.

Having resolved the motions pending before us, we return to the issue of constitutional standing. All Ouachita needs to establish associational standing is one person in each region who can establish standing. It is well settled that, in a NEPA suit, "a cognizable procedural injury exists when a plaintiff alleges that a proper EIS has not been prepared . . . when the plaintiff also alleges a 'concrete' interest—such as an aesthetic or recreational interest—that is threatened by the proposed actions." *Johnson*, 436 F.3d at 1278–79.

Applying that standard to the present facts, we conclude that Ouachita easily meets the constitutional test for injury in fact. Ouachita's declarations indicate that many of its plaintiffs use and will continue to use the forests in the three regions covered by the VMEISs and the EISs for recreation and, in some cases, for their livelihoods. (*See, e.g.*, R., *Wild South*, 12:Ex. M, Decl. of Tracy Davids ¶ 4–5 (regarding the Appalachian Mountains subregion, noting "I also use and enjoy the

biological, recreational and aesthetic values of [some of the forests at issue], and appreciate the complex interactions of plant and animal species which indicate the health of the National Forests. . . . The Forest Service's Secretary's failure to adequately analyze the environmental impacts of these timber sales has prevented the implementation of proactive measures that can prevent the decline of this area."); Appellant's Reply Br., Decl. of Norman F. (Buzz) Williams ¶ 8 (regarding the Appalachian Mountains subregion, noting, "I engage in hiking, canoeing, fishing, birdwatching, archeological and cultural studies throughout each of the three National Forests in the Chattooga watershed."); R., *Wild South*, 12:Ex. B, Decl. of Lamar Marshall ¶ 4 (regarding the Coastal Plain/Piedmont subregion, noting "I regularly participate in a wide range of recreational activities in the National Forests in Mississippi, often in the areas that are the subject of this lawsuit."); R., *Wild South*, 12:Ex. H, Decl. of Alvin Brooks ¶ 2 (regarding the Ozark/Ouachita subregion, noting "I have suffered personal harm due to Forest Service activities . . . . [H]erbicide drift from forestland above me contaminated my pond so that I could not claim the cattle I sold were 'organic.'").)[7] These declarations also allege quite clearly that the Forest

_____

[7] The excerpts quoted above are, of course, only a sample of the relevant declarations that Ouachita provided. The Forest Service makes a brief argument that some of these declarations are irrelevant because they relate to site-specific claims no longer involved in the present suit. (Appellee's Br. 30 n.4.) We find this argument curious; it is our understanding that the Forest Service analyzed the site-specific projects under the regional forest plans. If a plaintiff had standing to challenge a site-specific project (which is narrower and may require a tighter nexus

Service's failure to analyze the potential environmental impact of various projects and policy changes make it substantially more likely that the declarants' interests will be harmed. (*See, e.g.*, R., *Wild South*, 12:Ex. L, Decl. of Steven Krichbaum ¶ 10 (regarding the Appalachian Mountains subregion, noting "The implementation of [certain projects] without compliance with appropriate statutes and regulations will cause substantive injury to my scientific use and recreational and aesthetic enjoyment of [a forest at issue]."); Appellant's Reply Br., Decl. of Norman F. (Buzz) Williams ¶ 8 (regarding the Appalachian Mountains subregion, noting, "During these excursions, I have witnessed excessive siltation of the Chattooga River and ma[n]y of its tributaries from management activities on National Forests, including logging, road building, burning, and other vegetative management."); R., *Wild South*, 12:Ex. D, Decl. of Brandt Mannchen at 4 (regarding the Coastal Plain/Piedmont subregion, noting "I complained that the impacts that the Sierra Club observed reduced biodiversity of the riparian zone by removing or injuring hardwoods and other vegetation, increased sedimentation, and reduced shade on the stream and thus warmed the water. I also complained that the burning and logging make the trail less interesting to hike because there is less diversity of vegetation to observe."); R.,

---

with the area affected by the project), then *a fortiori* that plaintiff would have standing to challenge the regional plan under which the specific project was approved.

*Chattooga Conservancy*, 34:Ex. T, Decl. of David Reagan ¶ 9 (regarding the Ozark/Ouachita subregion, noting "The Forest Service's failure to collect population inventory data on Proposed, Endangered, Threatened, and Sensitive Species (PETS) has deprived both the agency and interested members of the public of information needed to assess the impacts of the agency's vegetation management on rare, sensitive, and declining wildlife and plants, and on wildlife generally . . . . This directly impacts my use and enjoyment of the forest, as these rare and sensitive species are a significant part of why I recreate there."); R., *Chattooga Conservancy*, 34:Ex. 5, Decl. of Jerry Williams ¶¶ 12–14 (regarding the Ozark/Ouachita subregion, noting "I have used [the forests] for hunting . . . fishing . . . recreation, observation of wildlife, and checking of Forest Service activities due to concern for damage to the forest resources . . . . I intend to keep using [the forests at issue], all of which will be harmed if these projects proceed forward as planned.").) In short, Ouachita's exhaustive declarations establish far more than a general public interest in the forests.

Constitutional standing also requires that Ouachita establish causation and redressability. Once, however, a plaintiff has established injury in fact under NEPA, the causation and redressability requirements are generally more relaxed. *See Cantrell*, 241 F.3d at 682. To establish causation, Ouachita must demonstrate only that it is reasonably probable that the challenged actions will threaten its concrete

15

interests.  *See, e.g.*, *Citizens for Better Forestry*, 341 F.3d at 972.

The Forest Service argues that none of the Ouachita plaintiffs can show that any alleged Forest Service activities will cause harm to any PETS species.  The Forest Service argues instead that the revisions and amendments to the forest plans (for which Ouachita alleges that the EISs were insufficient) have no on-the-ground impact.  Since, the Forest Service argues, Ouachita cannot demonstrate that the revisions and amendments demonstrably increase the risk of actual harm to at least one PETS species, Ouachita cannot establish causation.

This formulation of the causation test, especially in the NEPA context, is far too rigid.  The proper focus on causation is not harm to the environment, but harm to the plaintiffs.  *Laidlaw*, 528 U.S. at 181.  Here, as we discussed earlier, the plaintiffs were harmed when their procedural rights under NEPA were violated.  Since the Forest Service (according to Ouachita) failed to follow NEPA, it is clear that the Forest Service caused Ouachita's alleged injury.  That is the extent of Ouachita's burden to establish causation.

The final piece of constitutional standing is redressability.  The court, if it concludes that the Forest Service has failed to follow NEPA, has the power to order the agency to comply.  As the injury Ouachita asserts is the Forest Service's failure to comply with NEPA, that injury is plainly redressable.  *See, e.g.*, *Utah v. Babbitt*,

137 F.3d 1193, 1216 & n.37 (10th Cir. 1998). Ouachita has therefore satisfied the elements of constitutional standing.

Concluding that Ouachita meets the constitutional standing test does not entirely resolve the standing inquiry—Ouachita still must demonstrate that it has satisfied the nonconstitutional or prudential standing requirements. The relevant prudential inquiry is "whether a particular plaintiff has been granted a right to sue by the statute under which he or she brings suit." *City of Sausalito*, 386 F.3d at 1199. "Because NEPA does not provide for a private right of action, plaintiffs challenging an agency action based on NEPA must do so under the Administrative Procedure Act." *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). A plaintiff wishing to establish standing under the APA must show that there has been a final agency action adversely affecting it and that, as a result, it suffers a legal wrong or that its injury falls within the "zone of interests" of the statutory provision that the plaintiff claims was violated. *Nat'l Wildlife Fed'n*, 497 U.S. at 882.

The Forest Service has not challenged Ouachita's prudential standing in this suit. We tarry here only to note that any prudential challenge would be futile. It is well settled that "a final EIS or the record of decision issued thereon constitute[] final agency action." *Sw. Williamson County Cmty. Ass'n, Inc. v. Slater*, 173 F.3d 1033,

17

1036 (6th Cir. 1999). In addition, plaintiffs in the Ouachita coalition have alleged that the Forest Service's failure to comply with NEPA with respect to revisions to certain forest plans in the Southern Region have adversely affected the environment, which is the source of their injury. Finally, since the injury alleged is environmental, it falls within the zone of interests protected by NEPA (via the APA).

Thus, we conclude that Ouachita has satisfied both the constitutional and prudential standing tests and is therefore a proper plaintiff. We must now turn to the remaining justiciability issues in this appeal—ripeness, which the district court found dispositive, and mootness, which the Forest Service raised for the first time on appeal.

## 2. RIPENESS

We note at the outset of the discussion that the Forest Service has abandoned its ripeness challenge and instead frames its argument in terms of standing. (Appellee's Br. 20–22.) We pause here only to explain why Ouachita is correct that its claims are ripe for review.

We have noted in earlier decisions that delineating between the doctrines of standing and ripeness is particularly confusing. "Few courts draw meaningful distinctions between the two doctrines; hence, this aspect of justiciability is one of the

most confused areas of the law." *Wilderness Soc'y v. Alcock*, 83 F.3d 386, 389–90 (11th Cir. 1996). "When determining standing, a court asks whether these persons are the proper *parties* to bring the suit, thus focusing on the qualitative sufficiency of the injury and whether the complainant has personally suffered the harm. . . . When determining ripeness, a court asks whether this is the correct *time* for the complainant to bring the action." *Id.* at 390 (citations omitted).

The ripeness inquiry is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967). To decide whether an issue is ripe for judicial review, courts will examine both the fitness of the issue for judicial decision and the hardship on the parties if a court withholds consideration. *Id.* at 149.

That explanation is straightforward enough for a general ripeness inquiry, but NEPA adds an important twist. In a NEPA suit, the issue presented for review typically is whether the agency has complied with the statute's particular procedures. Because of the rather special nature of the injury (that is, the failure to follow NEPA), the issue is ripe at the time the agency fails to comply. "Hence a person with standing

19

who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998). As we see it, that is the end of the proper ripeness analysis in a NEPA suit.

The district court recognized the special nature of the NEPA injury but went on to note that:

> The [Supreme] Court may have been referring only to a failure to prepare an environmental impact statement (or environmental assessment). On the other hand, the Court may have been referring to other, broader NEPA claims such as the claimed failure of the environmental impact statement to take a "hard look" at the environmental consequences of an issue before deciding it. This latter type of challenge is close to being substantive; the former are not.

*Chattooga Conservancy*, 373 F. Supp. at 1370–71. The district court then concluded that, since Ouachita's NEPA claim is "as much substantive as it is procedural in nature," it is not ripe. *Id.* at 1371. The district court's point, we think, is that reviewing a NEPA claim requires it to look at the facts and, on some level, the substance of what took place in the agency proceedings. That may be true, but expanding that reasoning to conclude that NEPA is therefore "close to being substantive" ultimately confuses the issue.

The courts have been very clear that NEPA imposes a *procedural* duty upon

20

the agencies to take a hard look at the environmental consequences of their actions. *Ohio Forestry Ass'n*, 523 U.S. at (1998) (noting that NEPA "simply guarantees a particular procedure, not a particular result"); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("[I]t is well settled that NEPA itself does not impose substantive duties mandating particular results, but simply prescribes the necessary process for preventing uninformed—rather than unwise—agency action."); *Fund for Animals v. Rice*, 85 F.3d 535, 546 (11th Cir. 1996). When an agency fails to satisfy that *procedural* duty, a plaintiff's claim is ripe for review. We recognize the difficulty of reviewing the technical, nuanced agency action in this case. But the injury alleged is a proper (and therefore ripe) NEPA injury.

### 3. MOOTNESS

The final justiciability issue before us is the Forest Service's claim that Ouachita's challenge to Amendment 31 (which made the acquisition of PETS data more clearly a matter of Forest Service discretion) is moot. A case is moot when the issues no longer involve a live controversy with respect to which the court can give meaningful relief. *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1335–36 (11th Cir. 2001). "[T]he party asserting mootness bears 'the heavy burden of persuading the court that

21

the challenged conduct cannot reasonably be expected to start up again.'" *Wilderness Watch & Pub. Employees for Envtl. Responsibility v. Mainella*, 375 F.3d 1085, 1090 n.6 (11th Cir. 2004) (citing *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000)).

The crux of the Forest Service's mootness argument is that it has amended each of the forest plans at issue to remove the provisions that Ouachita claims were enacted in violation of NEPA. This argument, however, is little more than an assertion that the challenged provisions no longer exist and that no work is being done under them. Ouachita points out that a number of Forest Service projects approved under those provisions are still pending and lists the projects. (Appellant's Reply Br., Decl. of Jerry Williams ¶ 8.) It is difficult to ascertain the status of these projects on the evidence presented; we simply do not know whether the Forest Service is correct that these provisions no longer affect anything or whether Ouachita is correct that, although the provisions have been superseded, they still govern a number of projects. Since the tie goes to the runner in the mootness inquiry and we cannot ascertain whether the provisions have any effect, we must conclude that the Forest Service has failed to carry its heavy burden to establish that Ouachita's claims are moot. With that, we conclude our consideration of the threshold justiciability issues in this case.

## B. Amendment 31's NEPA Compliance

The only substantive issue that the Forest Service addressed on appeal was whether the Forest Service complied with NEPA in promulgating Amendment 31.[8] The Forest Service adopted Amendment 31 to the Ouachita National Forest Plan in 2000. Ouachita's primary argument is that Amendment 31 is arbitrary and capricious because the Forest Service failed to prepare an environmental impact statement *before* enacting the amendment, and conflicts with the VMEISs (which it failed to consider), especially their mitigation measures.[9] The district court concluded that Amendment 31 did not significantly alter the Forest Service's obligation to protect PETS species in the Ouachita National Forest.

The most difficult aspect of this issue is determining how it fits with *Sierra Club v. Martin*. 168 F.3d 1. In *Martin*, we concluded that the Forest Service was not following its own PETS-monitoring directives; it collected no population inventory information pertaining to certain PETS species despite language in the Forest Plans

___

[8] The text of Amendment 31 is repeated *supra* note 4.

[9] NEPA requires that all federal agencies, including the Forest Service, comply with mitigation measures. 40 C.F.R. § 1505.3. *See also Heartwood, Inc. v. U.S. Forest Serv.*, 230 F.3d 947, 949 (7th Cir. 2000).

clearly requiring it to do so. 168 F.3d at 4. After *Martin*, the Forest Service attempted to "clarify" its directives with a variety of amendments, including Amendment 31. The district court reasoned that the holding of *Martin* was limited to the fact that the Forest Service had collected no population inventory data, which clearly violated the Forest Plans. *Chattooga Conservancy*, 373 F. Supp. 2d at 1373. The district court further reasoned that the word "inventory" permitted "a measurement based on some type of estimating procedure." *Id.* at 1374. The district court then concluded that since the Forest Service was only adapting its directives to fit its activities, there was no environmental impact to consider. *Id.*

This interpretation unduly limits *Martin*. While the district court was correct to note that we took particular issue with the Forest Service's complete lack of data on PETS species, we also specifically noted that, at a more basic level, the forest plans required the Forest Service to keep inventory data on sensitive species. *Martin*, 168 F.3d at 4. The Forest Service, we concluded, was obliged to consider actual population data, not habitat data. *Id.* at 3–4. Because the district court analyzed Amendment 31 under an overly narrow view of *Martin*, the analysis is incomplete. We therefore remand the substantive analysis of Amendment 31, so that the district court may consider whether the Forest Service complied with NEPA in enacting that amendment in light of this broader reading of *Martin*.

## III. CONCLUSION

Accordingly, the judgment of the district court is REVERSED and the case is REMANDED for proceedings consistent with this opinion.[10]

---

[10] We acknowledge Ouachita's argument that we should decide this case on the merits at this point in the litigation. As we have explained, however, the district court dismissed Ouachita's claims on ripeness grounds and therefore did not reach the underlying substantive issues. Given the complexity of the facts, we decline to resolve the case on the merits on appeal. We finally note Ouachita's argument that the Forest Service submitted an inadequate administrative record. Since we reverse and remand this entire proceeding, we do not reach the issue but instead underscore it for the district court.