[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11079

_____

CENTER FOR A SUSTAINABLE COAST,
KAREN GRAINEY,

Plaintiffs-Appellants,

*versus*

U.S. ARMY CORPS OF ENGINEERS,
DISTRICT COMMANDER AND DISTRICT ENGINEER, U.S.
Army Corps of Engineers,
Savannah District,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 2:19-cv-00058-LGW-BWC

_____

Before GRANT, TJOFLAT, Circuit Judges, and HUFFAKER,* District Judge.

GRANT, Circuit Judge:

This is a classic procedural rights case. The Center for a Sustainable Coast, along with its member, Karen Grainey, sued the U.S. Army Corps of Engineers, upset that the Corps had issued a dock permit without full environmental review under the National Environmental Policy Act. The Center established injury by showing that several of its members regularly visit Cumberland Island, where the dock is sited, and suffer an ongoing aesthetic injury on those visits. The Center also showed that the environmental review the Corps skipped could have protected that interest, at least in theory.

That should have been enough. For procedural rights cases, though injury in fact remains a firm requirement, standards for both causation and redressability are relaxed. So long as a plaintiff alleges that the challenged (or omitted) procedure protects a concrete interest, causation and redressability typically follow—

_____

* The Honorable R. Austin Huffaker, Jr., United States District Judge for the Middle District of Alabama, sitting by designation.

even though we can't know whether that procedure, correctly performed, would have resulted in the substantive outcome that the plaintiff desires.

Here, though, the district court dismissed the lawsuit, concluding that the Center did not have standing because its harm was not redressable. The dock, it said, had already been built, so the court's ability to provide relief had ended along with construction.

We disagree. To start, the allegations here mirror those in other cases where this Court has found standing. The Center has identified a concrete aesthetic interest and pleaded that the NEPA process would protect that interest. Directing full NEPA review would thus redress the Center's procedural injury. Plus, the permit here does more than allow construction—it authorizes the dock's continued existence. So this case is not like the narrow set of procedural rights cases in which the plaintiffs' claims were dismissed as moot because the challenged project was already completed.

We thus hold that the Center had standing to bring at least one of its procedural rights claims. But we find the Center's administrative record argument premature for consideration, and we affirm the dismissal of the Seashore Act claim, because the Center abandoned that argument on appeal.

**I.**

Cumberland Island is the largest and southernmost of Georgia's barrier islands. Long used as a vacation retreat by

various Carnegies and other noteworthy tycoons, most of the island is scenic uplands and marshlands. *See High Point, LLLP v. Nat'l Park Serv.*, 850 F.3d 1185, 1188 (11th Cir. 2017). The United States has since acquired title to most of the island, designating more than 20,500 acres as wilderness or potential wilderness that is to remain in a "primeval" and "undeveloped" state. *Id.* at 1189, 1191 (quotation omitted). Still, some land remains in private hands, owned mostly by descendants of those who vacationed on the island during its heyday. *Id.* at 1188.

The status quo on Cumberland Island is maintained by the Cumberland Island National Seashore Act, 16 U.S.C. § 459i *et seq*. That Act designates the entire island as a National Seashore, and authorizes the Secretary of the Interior to recommend areas for a wilderness designation and to purchase or acquire "lands, waters, and interests therein." 16 U.S.C. § 459i, -1, -8. Property acquired by the Secretary must, with some exceptions, be preserved "in its primitive state," and "no development of the project or plan for the convenience of visitors shall be undertaken which would be incompatible with the preservation of the unique flora and fauna or the physiographic conditions now prevailing" on the island. *Id.* § 459i-5(b). But the Seashore Act does not prohibit the sale or use of private property on the island. *See id.* § 459i-3; *High Point, LLLP*, 850 F.3d at 1189.

Against that backdrop, Lumar LLC bought an undeveloped 82-acre residential plot from a private seller in the 1990s. In 2015, Lumar petitioned the Army Corps of Engineers for a permit to

build an access dock "adjacent to" its property. Corps approval was required under the Rivers and Harbors Act of 1899, which makes it unlawful to build certain structures in navigable rivers or waters of the United States unless the plans are "recommended" by the Corps and "authorized" by the Secretary of the Army. 33 U.S.C. § 403.

As it exercises that authority, the Corps is bound by the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* NEPA requires a rigorous approval process for any "major" projects, including both a formal environmental review and public notice and comment. *See* 33 C.F.R. § 325 app. B at 6a, 7a (2022). But sometimes these requirements can be skipped. Corps regulations list "categorical exclusions" from NEPA review, one of which is "applications which qualify as letters of permission." *Id.* § 325 app. B at 6a(5). These letters of permission are available when "in the opinion of the district engineer, the proposed work would be minor, would not have significant individual or cumulative impacts on environmental values, and should encounter no appreciable opposition." *Id.* § 325.2(e)(1)(i).

The Corps issued a letter of permission approving Lumar's proposed 500-square-foot dock—along with a gangway, pier head, and 200-foot walkway. That letter allowed the Corps (and Lumar) to avoid NEPA's ordinary approval process. This lawsuit followed from the Center for a Sustainable Coast, a 501(c)(3) organization whose members "use and enjoy Cumberland Island National Seashore for aesthetic, scenic, recreational, historical, cultural, and

6                    Opinion of the Court                    22-11079

scientific values."[1]  The Center asserts that its members suffer an aesthetic harm each time they view the dock.

The complaint raises two claims.  Count I argues that the decision to issue a letter of permission violated the Cumberland Island National Seashore Act because the Corps failed to properly consider the Act's mandate to preserve the island's primitive character.  Count II alleges that the decision to issue *any* letter of permission was arbitrary and capricious.  Instead, the Center claims, the Corps should have designated this a "major" project and conducted the more robust review required by NEPA.[2]

Rather than address the merits of the Center's argument, the district court granted summary judgment to the Corps, concluding that the Center lacked standing.  According to the

---

[1] The lawsuit was not filed until after the dock's completion.  The reasons for that delay, including whether Lumar consented to it, are not fully explained in the record, but we do not delve into that issue because it is irrelevant to the standing inquiry.

[2] Neither NEPA nor the Seashore Act contains a private cause of action.  *See Noe v. Metro. Atlanta Rapid Transit Auth.*, 644 F.2d 434, 435–36 (5th Cir. Unit B 1981); *Ctr. for a Sustainable Coast v. Nat'l Park Serv.*, 454 F. Supp. 3d 1347, 1351 (S.D. Ga. 2020).  Instead, the Center sued under the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(A), which provides a cause of action to challenge final agency action as (among other things) arbitrary and capricious.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (explaining that the APA "permits suit for violations of numerous statutes of varying character that do not themselves include causes of action").  Here, the Corps's letter of permission was the final agency action that allowed the Center to bring an APA challenge.

district court, every element of standing was present except one: redressability. In its view, even if the permitting defects alleged by the Center were corrected, the dock would still exist—and so would the Center's aesthetic injury. The Center appeals the district court's conclusion that neither of its claims were redressable.[3]

## II.

"We review issues of standing *de novo*." *Swann v. Sec'y, State of Georgia*, 668 F.3d 1285, 1288 (11th Cir. 2012) (quotation omitted). And we must "assume that on the merits the plaintiffs would be successful in their claims." *Culverhouse v. Paulson & Co.*, 813 F.3d 991, 994 (11th Cir. 2016) (quotation omitted).

## III.

### A.

The first claim we consider is Count II—the Center's NEPA claim—which the district court dismissed for lack of standing. A party has standing when it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."

---

[3] The Center also urges us to review the district court's decision to grant the Corps's motion to strike extra-record materials and confine the merits review to the administrative record. But that would be premature. Faced with a similar situation, the Ninth Circuit held that it did not need to address the parties' motions for judicial notice because they did not affect the resolution of the standing question. *Cantrell v. City of Long Beach*, 241 F.3d 674, 680 n.4 (9th Cir. 2001). So too here, where the district court held that the "disputed materials are admissible for standing purposes."

*Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (en banc) (quotation omitted).

We start with the "hard floor of Article III jurisdiction that cannot be removed by statute"—injury in fact. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). The Corps argued below that there was no such injury. But it no longer challenges that conclusion, and for good reason. At bottom, the Center's members allege an aesthetic injury from viewing the dock, which is a concrete interest. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992). They also allege a procedural harm related to the protection of that aesthetic injury: that the Corps failed to complete the full NEPA process (including a formal environmental review), choosing instead to issue a letter of permission. Finally, they connect that procedural harm with their concrete injury—if the full NEPA process had been followed, they argue, the dock would not have received a permit, which would have protected their well-pleaded aesthetic interests.

The injury here is identical to the one we encountered in *Ouachita Watch League v. Jacobs*, where we outlined what was necessary to show injury in fact in a procedural rights case: "a plaintiff must allege that the agency violated certain procedural rules, that these rules protect a plaintiff's concrete interests and that it is reasonably probable that the challenged action will threaten these concrete interests." 463 F.3d 1163, 1170 (11th Cir. 2006). We even mapped these points onto the NEPA context, explaining that "a cognizable procedural injury exists when a plaintiff alleges that

a proper [environmental impact statement] has not been prepared" and "also alleges a concrete interest—such as an aesthetic or recreational interest—that is threatened by the proposed actions." *Id.* at 1171 (quotations omitted). The Center's claim matches these elements point-by-point, establishing injury in fact.[4]

The connection between the Center's aesthetic harm and its procedural rights claim establishes the second standing element—causation—which has never been disputed here. After all, once a "plaintiff has established injury in fact under NEPA," the causation requirement is "generally more relaxed." *Id.* at 1172.

Only one pillar of standing remains—redressability.[5] To decide that issue, we usually ask whether "a court decision can

---

[4] It is undisputed that the Center has associational standing as an organization to sue on behalf of its members. *See Ouachita Watch League*, 463 F.3d at 1170–73.

[5] The district court also referenced several "prudential limits on standing," including that a plaintiff fall within the zone of interests to be protected by the statute. *See Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, No. 2:19-CV-58, 2022 WL 202893, at *4 (S.D. Ga. Jan. 21, 2022). But in *Lexmark*, the Supreme Court rejected the zone-of-interest test as a part of the standing inquiry and noted that as a general matter prudential standing requirements are "in some tension" with "the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (quotations omitted). After *Lexmark*, this Court has omitted the zone-of-interest question from our standing analysis, so the district court's consideration of it here was probably also unnecessary. *See id.* at 127–32; *see also Kurapati v. U.S. Bureau of Citizenship & Immigr. Servs.*, 775 F.3d 1255, 1260 (11th Cir. 2014). Still, because

either eliminate the harm or compensate for it." *Muransky*, 979 F.3d at 924. And it "must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Lewis v. Governor of Alabama*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (quotation and emphasis omitted).

But redressability looks a little different for so-called procedural rights. Like causation, redressability is relaxed once a plaintiff establishes injury in fact under NEPA. *Ouachita Watch League*, 463 F.3d at 1172. So a plaintiff with "a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *See Lujan*, 504 U.S. at 572 n.7.[6]

Recognizing these relaxed requirements, we have explained that a plaintiff bringing a NEPA challenge need not show with certainty that vindicating a procedural right will eliminate a non-procedural injury in fact. *Ouachita Watch League*, 463 F.3d at 1172; *see also Summers*, 555 U.S. at 496–97. Instead, when "a litigant is vested with a procedural right, that litigant has standing if there is *some possibility* that the requested relief will prompt the injury-

___

neither the district court below nor the parties on appeal rely on this zone-of-interest reasoning, we do not consider it further here.

[6] We reemphasize that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496; *accord Sierra Club v. Johnson*, 436 F.3d 1269, 1277 (11th Cir. 2006).

causing party to reconsider the decision that allegedly harmed the litigant." *Cahaba Riverkeeper v. EPA*, 938 F.3d 1157, 1162 (11th Cir. 2019) (emphasis added) (quotation omitted). And that makes sense; if certainty about future administrative outcomes was needed to show standing, citizen-suit provisions "would be a dead letter." *Sugar Cane Growers Co-Op of Florida v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002).[7]

Those principles decide this case. The procedural injury here is the Corps's failure to comply with NEPA, and "that injury is plainly redressable." *Ouachita Watch League*, 463 F.3d at 1173. In fact, redressability in circumstances like these is ordinarily seen as so obvious that we have dispatched with it in just a few sentences. *See id.* at 1173; *Cahaba Riverkeeper*, 938 F.3d at 1163. Here, the district court could vacate the letter of permission through a court order, remand to the Corps for new proceedings under NEPA, or both.[8] Each of those options would redress the Center's procedural injury.

---

[7] The dissent is laser-focused on whether the district court could grant the Center the ultimate relief it seeks—removal of the dock. *See* Dissent at 5–10. That perspective reflects a fundamental misunderstanding of the nature of the Center's injury and of the relief it seeks in this lawsuit. The Center does not allege only an aesthetic injury. It also alleges a *procedural injury* connected to the protection of that aesthetic interest: the Corps's failure to conduct full NEPA review. By focusing exclusively on what relief would remedy the Center's aesthetic injury, the dissent ignores how a court could remedy the Center's procedural harm—by requiring process.

[8] Vindicating the Center's rights does not require immediate vacatur of the permit—the district court could conceivably keep the letter of permission in

To be sure, it is possible that the Corps could complete the additional NEPA review that the Center seeks and still approve the dock. But a plaintiff has standing to sue over a procedural right "even though he cannot establish with any *certainty* that the [environmental impact] statement will cause the license to be withheld or altered." *Lujan*, 504 U.S. at 572 n.7 (emphasis added). Here, there is undoubtedly "some possibility" that different procedural inputs would lead to a different substantive outcome— deauthorization of the dock after a full environmental review. *See Cahaba Riverkeeper*, 938 F.3d at 1162 (quotation omitted). That is enough for standing in a procedural rights case.[9]

---

place while remanding to the Corps for further proceedings under NEPA. *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1289– 90 (11th Cir. 2015); Stephanie J. Tatham, *The Unusual Remedy of Remand Without Vacatur*, Admin. Conf. of the U.S. 49 (2014).

[9] The dissent, for its part, ignores these longstanding Eleventh Circuit and Supreme Court precedents, and it marshals no standing cases in support of its own position. Instead, it focuses on questions that this Court was not tasked with answering—such as whether the Center could petition the Corps under 33 C.F.R. § 325.7 for removal of the dock, or the effect of such a petition on speculative future litigation. *See, e.g.*, Dissent at 1, 5–10. Perhaps the Center could have filed such a petition. But that does not make this action improper (and certainly does not deprive the plaintiffs of standing). The APA's citizen-suit provision extends judicial review to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. The Center relied on this provision to file suit, pleading that the Corps's failure to abide by NEPA was a procedural harm. The only thing we need to consider is whether it has standing to file such a claim, and our precedents establish that it does.

**B.**

Both the district court and the Corps see things differently. They suggest that this ordinary conclusion is precluded because the dock is already built. Deauthorizing a construction permit for a completed project, they say, is meaningless.

To start, that contention goes to mootness, not redressability. But a more fundamental problem is that the letter of permission here is not limited to construction. As the Corps concedes, its permit authorizes both the temporary construction *and the subsequent existence* of the dock. *See* 33 C.F.R. § 325.6(a). So if the letter of permission is rescinded, Lumar's right to maintain the dock will disappear along with it.[10] That alone makes this case different from other NEPA suits where completed construction mooted actions involving construction-only permits. *See Save the Bay, Inc. v. U.S. Army Corps of Eng'rs*, 639 F.2d 1100, 1103 (5th Cir. 1981); *Florida Wildlife Fed'n v. Goldschmidt*, 611 F.2d 547, 549 (5th Cir. 1980).[11]

---

[10] The letter of permission explicitly contemplated the possibility of its own rescission. Lumar was warned that the Corps "may reevaluate its decision on this permit at any time the circumstances warrant," including if significant "new information surfaces which this office did not consider in reaching the original public interest decision."

[11] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down before the close of business on September 30, 1981).

The failure to recognize the difference between those cases and this one is also reflected in another flaw in the Corps's argument—its failure to concede the nature of a successful outcome in a procedural rights case. The Corps emphasizes the district court's conclusion that it can neither order the dock torn down nor order the Corps to initiate enforcement action to remove it. *See Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, No. 2:19-CV-58, 2022 WL 202893, at *6 (S.D. Ga. Jan. 21, 2022). True. But focusing on whether the court could demand the dock's destruction misunderstands what the Center is seeking *in this action*—NEPA review. *See, e.g.*, *Lujan*, 504 U.S. at 572 n.7 (hypothetical plaintiff would have standing to challenge failure to prepare an environmental impact statement); *Sierra Club v. Johnson*, 436 F.3d 1269, 1275, 1278–79 (11th Cir. 2006) (standing to challenge existing permit for insufficient public notice and comment). The real question is whether the court can offer relief for the plaintiff's alleged procedural harm.

Here, the Center's NEPA claim (Count II) is a procedural rights claim. So what matters is that the administrative process the Center seeks would create some possibility that the Corps would rescind the permit, which still authorizes the continued existence of the dock. Maybe NEPA review would result in the denial of the dock permit; maybe not. But the answer to that question is irrelevant for the purposes of this standing analysis. A procedural

violation is remedied by process, and so long as that process protects a concrete interest, the plaintiff has shown redressability.[12]

**IV.**

We now turn to the Center's arguments in Count I—that the Corps violated the Seashore Act when it issued the letter of permission. The Center has abandoned this claim by failing to specifically argue it on appeal. *See, e.g.*, *Wood v. Raffensperger*, 981 F.3d 1307, 1316 (11th Cir. 2020). The Center did not cite the Seashore Act's text once in its standing analysis. The Center should have preserved its arguments about Count I by raising them

---

[12] We reject the dissent's contention that the Center's suit will result in a "hypothetical district court decision." Dissent at 10. To the contrary, vacatur under 5 U.S.C. § 706(2)—"the ordinary APA remedy"—would operate on the Corps's final agency action. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1289–90 (11th Cir. 2015) (quotation omitted). Respectfully, it is the dissent that spends pages discussing hypotheticals— whether it be alternative avenues for relief, predicted behavior of the parties (and non-parties), or supposed future lawsuits. *See id.* at 5–8. For our part, the only question we are concerned with is whether the Center has alleged a procedural injury. It has.

Along the same lines, the dissent accuses the majority of "not point[ing] to which action, from among those asserted by the Center, that the Corps was *required* to take." Dissent at 5 n.3 (emphasis added). Of course we do not— the question on appeal is whether the Center had standing, not how the merits of the case should be resolved. From this lack of merits analysis, the dissent infers that the Center has not alleged any "discrete agency action that [the Corps] is required to take." *Id.* (emphasis and quotation omitted). That, too, is incorrect. In Count II, the Center asserts that the Corps was required to engage in full NEPA review before issuing the letter of permission.

"plainly and prominently," perhaps by "devoting a discrete section of [its] argument to those claims." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (quotation omitted).

Because the Center abandoned its argument here, we affirm the lower court's decision that the Center lacked standing to bring Count I. But the Center may still argue (as part of Count II) that the Seashore Act is one reason that issuing a letter of permission rather than completing a NEPA review was arbitrary and capricious.

⋆    ⋆    ⋆

The Center's NEPA claim satisfies the threshold for redressability that we employ in cases involving procedural rights—there is some possibility that the requested relief (NEPA review) will prompt the Corps to reconsider its decision to allow the dock. Consequently, we **REVERSE** the district court's decision to grant summary judgment for lack of standing on the NEPA claim in Count II, but **AFFIRM** as to the Seashore Act claim in Count I.

22-11079          TJOFLAT, J., Dissenting          1

TJOFLAT, Circuit Judge, Dissenting:

The Center for a Sustainable Coast is seeking the removal of Lumar's dock that has already been constructed off Cumberland Island. That is the Center's objective. The majority allows the Center to obtain a judgment against the U.S. Army Corps of Engineers that will be of absolutely no value to the Center in pursuing its objective. A favorable judgment in this case will have no legal effect on Lumar because Lumar is not party and will not be in privity with the Corps. The Center could ask the Corps to revoke Lumar's permit pursuant to 33 C.F.R. § 325.7, but for reasons not apparent in the record, it has chosen not to do so.

Before elaborating on why the path the Center is taking will not grant it the relief it seeks, I describe the applicable regulatory structure.

## I.  Regulatory Structure

Lumar LLC owns a plot of land on Cumberland Island. It wanted a dock to access its land. Because this dock would extend into the navigable rivers or waters of the United States, its construction would be subject to the Rivers and Harbors Act of 1899, the Clean Water Act, and several other laws and regulations. The Army Corps of Engineers has designed a system to ensure compliance with all of these sources of law. *See* 33 C.F.R. pt. 325 (outlining the process for applying for and obtaining a Department of the Army (DA) Permit). The Corps is also required to follow the National Environmental Policy Act (NEPA), and it has set forth "procedural guidance for preparing and processing NEPA

documents for regulatory actions" in 33 C.F.R. Part 325, Appendix B. *Id.* § 230.1.

A DA permit may take the form of an individual permit or a general permit. *Id.* § 325.5(a)(1). Individual permits are issued on a form, ENG Form 1721,[1] or, alternatively, in the form of a letter of permission (LOP).[2] *Id.* § 325.5(b). An LOP will be issued when § 325.2(e)(1)'s procedures have been followed. *Id.* § 325.5(b)(2). Section 325.2(e)(1) states LOPs may be used for projects "subject to section 10 of the Rivers and Harbors Act of 1899 when, in the opinion of the district engineer, the proposed work would be minor, would not have significant individual or cumulative impacts on environmental values, and should encounter no appreciable opposition." *Id.* § 325.2(e)(1)(i). Importantly, "[a]ll applications which qualify as letters of permission" under § 325.5(b)(2) are also "not considered to be major Federal actions significantly affecting the quality of the human environment and are therefore categorically excluded from NEPA documentation." *Id.* pt. 325, App. B at 6a(5). "Fixed or floating small private piers" and "small docks" are also subject to this categorical exclusion. *Id.* at 6a(1).

The Corps issued Lumar an LOP to build the dock at issue here. The LOP contained General Conditions. One of the

---

[1] ENG Form 1721 can be found in 33 C.F.R. Part 325, Appendix A. 33 C.F.R. 325.5(a)(1).

[2] The regulation does not prescribe the use of a specific form. Rather, each LOP is framed to meet the exigencies of the situation at hand.

conditions read as follows: "The work authorized by this Individual Permit is valid for a period of three years from the date of issuance unless modified, suspended or revoked by the District Engineer."

## II. Process to Rescind Permit

The procedure for modifying, suspending, or revoking permits issued by the Corps is found in 33 C.F.R. § 325.7. This is made clear by the text of the LOP issued to Lumar and ENG Form 1721. Any permit may be reevaluated by the district engineer "on his own motion, at the request of the permittee, or a third party, or as the result of periodic progress inspections." 33 C.F.R. § 325.7(a). The district engineer may, in the exercise of his discretion, "initiate action to modify, suspend, or revoke a permit as may be made necessary by considerations of the public interest." *Id.*

The regulation also provides the factors the district engineer should consider in exercising his discretion in deciding whether to modify, suspend, or revoke a permit. *Id.* The factors are:

> [T]he extent of the permittee's compliance with the terms and conditions of the permit; whether or not circumstances relating to the authorized activity have changed since the permit was issued or extended, and the continuing adequacy of or need for the permit conditions; any significant objections to the authorized activity which were not earlier considered; revisions to applicable statutory and/or regulatory authorities; and the extent to which modification, suspension, or other action would adversely affect plans, investments and actions the

permittee has reasonably made or taken in reliance on
the permit.

*Id.* These factors are rooted in principles of due process to ensure
that permittees are on notice of any changes in the circumstances
and conditions relating to the permit or objections and are treated
fairly.

Subsections (b), (c), and (d) of § 325.7 go on to list other
procedures for the protection of permittees. For example, a
permittee must be notified in writing of the district engineer's
decision under § 325.7(a). *See id.* § 325.7(b)–(d). The decision
becomes effective ten days after the permittee receives the notice
unless the permittee requests a meeting with the district engineer
or a public hearing, in which case the effect of the district
engineer's decision is held in abeyance. *See id.* Public hearings are
governed by 33 C.F.R. Part 327. *Id.* § 325.7(c); *see also id.* § 327.3
(stating "the modification, suspension or revocation of any DA
permit" is the kind of permit action covered by the policies and
procedures for public hearings contained herein). The steps the
district engineer may take to enforce a § 325.7 decision are provided
in 33 C.F.R. Part 326. *See id.* § 326.1.

The district engineer may recommend that the Corps
pursue a criminal or civil action in the U.S. District Court "to obtain
penalties for violations, compliance with the orders and directives
he has issued pursuant to §§ 326.3 and 326.4, or other relief as
appropriate." *Id.* § 326.5(a). "Appropriate cases for criminal or civil
action include, but are not limited to, violations which, in the

22-11079                TJOFLAT, J., Dissenting                5

district engineer's opinion, are willful, repeated, flagrant, or of substantial impact." *Id.* Part 326 also makes clear that "[n]othing contained in this part shall establish a non-discretionary duty on the part of district engineers nor shall deviation from these procedures give rise to a private right of action against a district engineer." *Id.* § 326.1.

It is clear that 33 C.F.R. § 325.7 alone establishes the procedure the Center must pursue if its objective is the removal of the dock. The Center may request the district engineer to reevaluate Lumar's permit and in his discretion, to "modify, suspend, or revoke [its] permit as may be made necessary by considerations of the public interest." *See id.* § 325.7(a). In exercising his discretion, the district engineer would consider several factors, such as the substantial investment Lumar made in reliance on its permit.

If the district engineer decides to revoke Lumar's permit, Lumar would likely request a public hearing, which would be governed by 33 C.F.R. Part 327. Then, if the decision is sustained and the district engineer orders Lumar to remove the dock but Lumar fails to remove it, the district engineer will likely invoke the procedures of 33 C.F.R. Part 326. The Center cannot avoid § 325.7 by maintaining this APA action against the Corps and challenging

6                    TJOFLAT, J., Dissenting                    22-11079

the district engineer's issuance of the LOP to Lumar in the exercise of his discretion.[3]

### III.  Effect of This Judgment on Lumar

In this lawsuit, the Center seeks an injunctive order requiring the Corps to vacate the district engineer's issuance of Lumar's LOP on the ground that the issuance was arbitrary and capricious.  If it prevails in this lawsuit, the Center anticipates that the Corps will sue Lumar in the same District Court for an injunctive order requiring it to tear down the dock.  Presumably, the Corps will rely for its authority on the District Court's APA decision, arguing that the APA decision of the District Court, as the "rendering court," resolved any issues Lumar might raise in its defense of the Corp's claim for injunctive relief *and* that the District Court, now operating as the "recognizing court," will be bound to enforce its rendering court decision.

---

[3] 5 U.S.C. § 706(1) limits the federal courts' power on APA review to compel agency action.  *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) ("[T]he only agency action that can be compelled under the APA is action legally *required*. . . . Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*.").  The majority does not point to which action, from among those asserted by the Center, that the Corps was required to take.  As described in Parts I and II, issuing and revoking DA permits along with enforcement actions for noncompliance with a permit or acting without a permit at all, are entirely committed to the agency's discretion.  *See* 5 U.S.C. § 701(a)(2).  Therefore, these actions are beyond judicial review.

I refer to the District Court in its present posture as the rendering court and in its position in entertaining the Corps's anticipated lawsuit against Lumar as the recognizing court. Presumably, the Corps will tell the recognizing court that it is bound by the rendering court's decision. The question will be whether a rendering court can bind a recognizing court to give its resolution of the issues before the recognizing court preclusive effect. The answer to that question will be emphatically: No.

It has been a time-honored principle of law that a rendering court cannot bind a recognizing court to give the issues it has resolved preclusive effect. Whether a recognizing court gives a rendering court's decisions preclusive effect—say under principles of res judicata or collateral estoppel[4]—is exclusively the recognizing court's job. Where, as here, Lumar will not have been a party in the rendering court *and* the issues the rendering court decides will not be the issues the recognizing court will be called on to decide, there can be no issue preclusion. It would be a violation of Lumar's right to due process if the recognizing court precluded the issues before it on the basis of the rendering court's supposed resolution of those issues.

Consider res judicata. The doctrine would have no application because Lumar was not a party in the rendering court

---

[4] For a more comprehensive discussion of res judicata and issue preclusion, see my dissent in *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1213–21 (11th Cir. 2017) (en banc) (Tjoflat, J., dissenting).

proceeding and it could not be held to have been in privity with the Corps in that proceeding because its interests and the Corps's were adverse in that litigation.

What about issue preclusion? There would be none because the issues litigated in the recognizing court proceeding would not have been present in the rendering court proceeding. Moreover, fundamental principles of due process would preclude the recognizing court from denying Lumar its day in court—its right to argue that the § 325.7 factors, especially the investment it made in reliance on its LOP, precluded the revocation of its LOP. "A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).

Suppose the Center, on remand, moved the District Court for leave to join the Lumar in the instant litigation pursuant to Federal Rule of Civil Procedure 19 as an indispensable party. *See* Fed. R. Civ. P. 19(a)(1)(A). Would that step aid the Center in pursuing its objective? The answer is No for two reasons. First, Lumar is not an indispensable party because none of the issues the District Court qua rendering court resolved would have any preclusive effect in the District Court qua recognizing court. Second, even if the District Court here granted the Center leave to join Lumar as a defendant, the later District Court as the recognizing court in the action brought by the U.S. Attorney, would give this District Court's decision no legal effect.

22-11079                TJOFLAT, J., Dissenting                9

The idea that Lumar would forego its due process rights and abide by any decision the rendering court might make is far-fetched. No lawyer in his or her right mind would counsel Lumar to tear down the dock. To get the dock removed, the Corps would need to take a discretionary action called for by § 325.7 in a separate proceeding, which the LOP makes clear, and the majority opinion also acknowledges. *See* Maj. Op. at 13–14.

## IV. Conclusion

Removal of Lumar's dock remains the only relief that redresses the Center's aesthetic injury here. First off, the Center's concrete injury for standing purposes comes from their alleged "aesthetic injury from viewing the dock." Therefore, Lumar could stop using the dock tomorrow, by choice or because a permit for its use is vacated or revoked, and the Center's aesthetic injury would remain.[5]

Next, vacatur or revocation of a permit for the dock's existence under § 325.7 still would not provide *any* relief for that aesthetic injury. Since the dock has already been built and viewing it is the root of the Center's injury, removal of the dock is the only way to redress that injury. The Center's counsel admitted as much

---

[5] It is important to note that our case "'hinge[s] on the independent choices of third parties not before this court,'" namely Lumar, and that distinguishes it from the procedural standing cases cited by the majority. *See Food & Water Watch v. United States Dep't of Agric.*, 1 F.4th 1112, 1116 (D.C. Cir. 2021) (quoting *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005)) (alteration in original).

at oral argument. The majority opinion also recognizes that in the instant case the District Court "can neither order the dock torn down nor order the Corps to initiate enforcement action to remove it." Maj. Op. at 13–14.

As the District Court and Corps have both stated, the nature of the permitting scheme is such that the Corps's authority extends only to authorizing the construction and presence of the dock. To remove the dock—the only thing that can redress the Center's concrete injury—the Corps would have to bring an enforcement action against Lumar under 33 C.F.R. § 326.5, and if Lumar failed to comply with the Corps's decision, the Corps would have to sue Lumar for injunctive relief.

When boiled down, given that Center's goal is the dock's removal, this case is nothing but a waste. It will result in a hypothetical district court decision, the sort of exercise Article III abhors. To me, there is nothing in the standing jurisprudence that would counsel a federal district court to engage in the exercise. I respectfully dissent.